UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADELE CLUM,

        Plaintiff,

vs.

        Case No. 11-cv-10505
        HON. GERSHWIN A. DRAIN

JACKSON NATIONAL LIFE INSURANCE
COMPANY,

        Defendant.
_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#30]

**I. INTRODUCTION**

Plaintiff, Adele Clum, filed the instant action against her former employer, Jackson National Life Insurance Company ("Jackson"), claiming that Jackson violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MICH. COMP. LAWS § 37.1101 *et seq.* by terminating her on October 14, 2009 for allegedly violating Jackson's attendance policy.

Presently before the Court is Jackson's Motion for Summary Judgment, filed on June 29, 2012.[1] Jackson argues that it did not violate the FMLA when it terminated Clum's employment for violating Jackson's attendance policy because Clum's only timely medical certification indicated

---

[1] On October 3, 2012, this matter was reassigned to the undersigned from the Honorable Mark Goldsmith pursuant to Administrative Order 12-AO-018.

that she was able to perform her customer service representative job duties with one hand. Jackson further asserts that it is entitled to judgment in its favor relative to Clum's disability discrimination claims because her finger pain does not qualify as a disability under the ADA or PWDCRA, nor can she identify similarly situated employees treated more favorably than she was treated. This matter is fully briefed and a hearing was held on January 28, 2013. For the reasons that follow, the Court grants in part and denies in part Jackson's Motion for Summary Judgment.

## II.   FACTUAL BACKGROUND

Clum began her employment with Jackson on August 9, 2000.[2] At the time of her termination, Clum was employed as a Level 3 Senior Customer Service Representative, which is a clerical position. According to Clum, a Level 3 Senior Customer Service Representative's duties include the same duties as a Level 1 and Level 2 Customer Service Representative, as well as required her to assist lower level customer service representatives when needed.

On March 24, 2008, Jackson provided Clum with an Ergonomic Assessment and thereafter provided her with certain ergonomic equipment due to Clum's neck condition. *See* Def.'s Mot. for Summ. J., Ex. 25. Clum took a leave of absence from July through October of 2008 due to neck pain and eventual surgery on her neck. The August 19, 2008, surgery involved a five-level laminectomy and fusion of her cervical vertebrae. *See* Plf.'s Resp. in Opp., Ex. 21. On September 17, 2008, Jackson sent correspondence to Clum stating, "[t]his letter is to inform you that your Leave of Absence under the Family and Medical Leave Act (FMLA) has been approved to continue effective 9/17/08 . . . .Your last day covered under FMLA will be October 2 based on previous occurrences.

---

[2] The parties dispute Clum's start date with Jackson. Jackson maintains that Clum began her employment on August 9, 1999.

*See* Def.'s Mot. for Summ. J., Ex. 30.  When Clum returned to work, Jackson provided her with special equipment and extra breaks because of her medical condition.  *Id*., Ex. 31.

Clum maintains that Jackson frequently resisted when she applied for FMLA protection. Initially, Sheri Thuma, Jackson's Senior Leave Management Specialist, failed to provide Clum with the FMLA paperwork for her neck condition because her doctor's appointment was scheduled for the afternoon rather than in the morning.  Clum further asserts that when she returned to work after her neck surgery, she was met with hostility.  Her manager, Yesenia Akright, became rude and abrupt.  *See* Plf.'s Resp. in Opp., Ex. 1, Dep. Tr. of Adele Clum at 24.  When Clum requested time off for her medical condition, Akright rolled her eyes.  *Id*. at 30.   On February 17, 2009, Thuma sent email correspondence to Katie Rypstra, Jackson's Staffing and Associate Relations Representative, with the subject line "Status of medical condition," which stated:

> This associate is out of FMLA and won't be eligible until June . . . For your info, she is a "Red Flag" associate, therefore needs to be monitored closely. . . . Alyssa handled her when she was on FMLA, so she can fill you in with her "pattern" of leaves.

*Id*., Ex. 23.

Clum asserts that when she returned to work, as well as at the time of her discharge, her neck condition resulted in the impairment of her ability to walk, bend, stand, sleep and work.  Prior to her surgery, Clum regularly walked two to three miles per day.  After her surgery, she was unable to walk more than a couple of hallways, could not bend for extended periods of time, could stand for no more than fifteen minutes, and suffered from erratic sleep patterns secondary to her neck pain.

On March 10, 2009, Clum submitted a written request to work from home due to her neck condition.  On March 12, 2009, Rypstra sent email correspondence to Clum advising her that Jackson had "no medical documentation supporting [her] request for an accommodation."  *Id.*, Ex.

33. On March 18, 2009, Clum retracted her request to work from home, stating: "I had requested to work from home prior. I would rather be at work so I went over a plan with my doctor." *Id.*, Ex. 34. Clum requested additional break time at work. *Id.* On March 29, 2009, Jackson provided Clum with ergonomic equipment and additional breaks during the work day. *Id.*, Ex. 35. Clum claims that when she requested time off from work in May of 2009 for a procedure she needed performed on her neck, Akright denied the request because there were "too many people on leave." *See* Plf.'s Resp. in Opp., Ex. 1, Dep. Tr. of Adele Clum at 25. On September 1, 2009, Jackson approved Clum's request for intermittent FMLA leave, including for prior absences associated with her neck condition, occurring on July 27, 2009, through July 31, 2009. *Id.*, Ex. 36.

Jackson's Operations Services Attendance Guidelines provide that an "unplanned occurrence" is "any time off not pre-approved by a manager, CCS, or other authorized individual at least a day prior to the occurrence." *See* Def.'s Mot. for Summ. J., Ex. 5. The guidelines provide that a first written warning must be given to an employee after five unplanned occurrences in a rolling twelve month period. *Id.* Employees are subject to termination after seven unplanned occurrences in a rolling twelve month period. *Id.* The guidelines further provide that "[i]n all cases, business needs will prevail in determining appropriate action." *Id.*

On May 29, 2009, Clum was given a first written warning that she had incurred five unplanned absences in a rolling twelve month period. *See* Def.'s Mot. for Summ. J., Ex. 6. The dates of the unplanned absences were: January 5, 2009, February 19, 2009, March 2, 2009, May 1, 2009, and May 21, 2009. *Id.* This warning also stated that, "[i]f unplanned absences continues to be a problem, dismissal from JNL, without issuance of another warning or improvement plan, may occur." *Id.* On August 14, 2009, she was given the following performance evaluation for the period of January 1, 2008 through December 31, 2008:

> [Y]ou have done a great job meeting standards in your current position. You always go the extra mile to follow through and make sure our customers feel appreciated and satisfied. You pro-actively seek feedback for areas of development. Your ability to be flexible and assist the team in meeting goals is appreciated. You are always on time and meet attendance guidelines.

*See* Plf.'s Resp., Ex. 20. This review also stated that "[y]ou had a total of 3 unplanned absences for the calendar year 2008 and 1 adherence to schedule violation." *Id.*

On September 23, 2009 and September 28, 2009, Clum incurred two additional unplanned occurrences. Clum claims that on September 23, 2009, her neck and hand pain flared up again. Clum's team leader, Rose Villegas, let Clum leave work early that day. Clum went to her treating physician, who referred her to William Truluck, D.O., a hand surgeon. Dr. Truluck's preliminary diagnosis of Clum's hand condition was tendinitis and calcification. *See* Plf.'s Resp. in Opp., Ex. 15, Dep. Tr. of Dr. Truluck at 39. He ordered an MRI to determine whether surgery would be necessary, as well as a steroidal anti-inflammatory. He splinted her hand and told her she could not work with her ailing hand and that she was restricted to performing one-handed work. Clum returned to work the next day, performing her job duties with one hand. Using only one hand caused pressure on Clum's neck causing her neck pain to intensify. *Id.*, Dep. Tr. of Adele Clum at 50.

On September 24, 2009, Thuma provided Clum with a Notice of Eligibility and Rights and Responsibilities form advising Clum that she must provide Jackson a Certification of Health Care Provider no later than October 9, 2009 to justify her FMLA leave request for her serious health condition, and that "[i]f sufficient information is not provided in a timely manner, your leave may be denied." *See* Def.'s Mot. for Summ. J., Ex. 13. Over the next weekend, Clum's hand and neck pain became extreme. She called in on Monday, September 30, 2009, leaving voice mail messages with Akright and Villegas that she could not come into work due to her neck and hand pain. *See* Plf.'s Resp. in Opp., Ex. 1, Dep. Tr. of Adele Clum at 52. The following day, Dr. Truluck

prescribed Clum narcotic pain medication and advised her against working while she was on narcotic pain medication. *Id.*, Dep. Tr. of Dr. Truluck at 47. On October 2, 2009, Dr. Truluck prescribed yet another pain medication, Ultram. *Id.* at 57. Clum again called Villegas and Akright stating that she was still experiencing hand and neck pain. *Id.*, Ex. 1, Dep. Tr. of Adele Clum at 56. Jackson denies that Clum advised Thuma or Akright that her absences in September and October of 2009 were related to her neck condition.

Also on October 2, 2009, Dr. Truluck faxed Jackson a medical certification for Clum. *Id.*, Ex. 3. In response to the question, "[i]s the employee unable to perform any of his/her job functions due to the condition," Dr. Truluck replied, "no." *Id.* The certification also stated that Clum "would be able to do one handed work." *Id.* Dr. Truluck's records show that Clum was seen on September 23, 2009, September 25, 2009 and October 5, 2009 for "exquisite pain" and "swelling" and that she has a past medical history of "cervical disk disease." *Id.*, Ex. 23. These records further show that she received an injection of Lidocaine and Celestone, prescriptions for Medrol, oral antibiotics and Norco, a narcotic pain reliever." *Id.* However, it is uncontested that Jackson was never provided with these medical records when it reviewed Clum's FMLA leave request. Dr. Truluck testified at his deposition that he understood the question on the certification form to ask whether in the future Clum would suffer incapacity from work, and not whether she was incapacitated from work September 28, 2009 through October 5, 2009.

On October 6, 2009, Thuma advised Clum that Jackson denied her FMLA leave request because the October 2, 2009 certification did not provide support for her request. *Id.*, Ex. 14. Clum insists that she asked how the paperwork was insufficient, but Thuma never provided a response. However, on October 7, 2009, Thuma replied to Clum's inquiry as to why her FMLA request had been denied indicating that "[i]t is up to the Health Care Provider to complete the FMLA paperwork

-6-

based on his knowledge of your condition and your job functions. Based on his completion of the form, you do not qualify." *See* Def.'s Mot. for Summ. J., Ex. 14. Also on October 6, 2009, Akright sent email correspondence to Rypstra advising her that Clum's FMLA leave request was denied and that the unplanned occurrences in September would result in seven unplanned absences that, according to the guidelines, could result in discharge. *Id*., Ex. 15.

On October 14, 2009, Donna Douglas, Jackson's Human Resources Manager, telephoned Dr. Truluck's office. Thuma was present during the phone conversation. During the call, Douglas spoke with Amy Hollerin, Dr. Truluck's Officer Manager and Assistant. Hollerin advised Douglas that Dr. Truluck released Clum from work for the dates in question. *See* Plf.'s Resp. in Opp., Ex. 10, Dep. Tr. of Donna Douglas at 52. She also advised that Clum was unable to work those dates because of the narcotic medication she had been prescribed. *Id.* at 53. Hollerin informed Douglas that the office planned to write a release from work slip for Clum. Douglas's notes from the phone conversation state in relevant part:

> I proceeded to ask if it was normal practice for them to write someone (patient) off work without being seen. She stated they did see her on 9/23 and based on [Clum]'s calls previously, they would write a "release from work" note for the patient. Amy indicated that [Clum] contacted them on 9/29 for pain medication.
> \* \* \*
> She stated that pain medicine made her unable to drive to work. I asked Amy if they were completing another FMLA certification for [Clum] because [Clum] told us that the one they sent was in "error." Amy stated that was "not true" and they stand by the completed certification. She also stated that they were releasing [Clum] from their care.

*See* Plf.'s Resp. in Opp., Ex. 11.

Also on October 14, 2009, Hollerin prepared notes concerning Clum, the notes state in relevant part:

> s/w pt today. She was very upset–she had called into work on 9-28, 9-29, 10-1, 10-2 and 10-5 due to "severe" pain in her hand and states she was unable to work because

-7-

> the pain was so bad. She had not called during any of those days to be taken off so I told her we don't give off work slips due to hand pain-especially if we have not seen her during that time-pt got very mad and told me if she lost her job she would sue us and hung up.
>
> I called and spoke with Sheri Thuma @ JNL. I told Sheri at this time we would not be seeing Adele back in our office and explained she threatened us if we would not place her off work and she lost her job.
>
> Received a call back from Adele-she had just spoken with Sheri and wanted us to know her comment was taken out of context and would we please continue to see her.
>
> Adele showed up at our office in tears-causing a big scene at the front window. I took her back to an exam room where she informed me she had lost her job. I told her that was not our intention but we don't usually give off work slips for pain. I did make an exception after thinking . . . the doctor and gave her a slip for the days she had missed but did advise her we would NOT be seeing her back in our office.

*See* Def.'s Mot. for Summ. J., Ex. 17. Thereafter, Dr. Truluck's office faxed a Work or School Status Report indicating that Clum was off from work on September 28, 2009, September 29, 2009, September 30, 2009, October 1, 2009, October 2, 2009, and October 5, 2009 for hand pain.

Dr. Truluck sent correspondence to Clum on October 14, 2009. *See* Def.'s Mot. for Summ. J., Ex. 20. Dr. Truluck's letter stated in relevant part:

> I am writing this letter to inform you that I am discharging you from my practice. We will give you an off work slip for the days you missed secondary to your hand pain but at this point I don't think I can reasonably treat you at this time. You have basically threatened me with legal action if you lose your job. This is not a good relationship to have between a physician and patient.

*Id*.

On October 16, 2009, Clum sent email correspondence to several Jackson employees entitled "Happy Boss' Day from Lynn Clum" and stated in relevant part:

> I did not do anything wrong. I would not just come to work and fake a medical condition as I would not like it if someone did that. I had FMLA for my neck and could have called in and said my neck hurt and I would have been covered, but I'm an honest person and cannot do that. My doctor's nurse filled out the paperwork

> incorrect and I advised her of this the day I was there and she said she would look at the chart and call me. She never called me back so I tried to call her and left 4-5 messages with the office staff and she said she only received one that was the day before I was fired. When she faxed the paperwork in the next day, the day I was fired it was to[o] late. I lost my job that I enjoyed because of her errors. I'm going to fight this. Sorry I have to even write. HAPPY BOSS' DAY!!.

*Id.,* Ex. 24. While Clum claimed in her October 16, 2009 email that her FMLA request was not associated with her neck condition, she denies that she never orally advised Jackson that her FMLA leave request was based on her hand condition and neck condition.

Jackson discharged Clum for unplanned occurrences on October 14, 2009. The individuals involved in discharging Clum were Yesenia Akright, Sheri Thuma, Donna Douglas, Katie Rypstra and Bruce Raak, Jackson's Human Resources Manager. Clum maintains that Jackson discharges its employees for attendance issues in an inconsistent manner. She asserts that Kelly Clark, Marisa Delgado, and Wendy Gutierreck Smith, all Level 1 or 2 Customer Service Representatives, had unplanned occurrences sufficient to warrant discipline, however they were not disciplined. Clum further argues that Jackson has never discharged an employee for absences covered under the FMLA.

### III.  LAW & ANALYSIS

#### A.  Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored

procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

**B.     Defendant's Motion for Summary Judgment**

**1.     FMLA**

### a. Interference

The FMLA entitles an employee to twelve weeks of unpaid leave each year if the employee has a "serious health condition" which prevents the employee from being able to perform the functions of his or her job. *See* 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *See* 29 U.S.C.§ 2611(11).

To ensure entitlement to FMLA leave, the Act makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." *See* 29 U.S.C. § 2612(a)(1). The FMLA permits an employer to request that an employee submit a medical certification form to support his or her request for FMLA leave. *See* 29 C.F.R. § 825.306(a). Where the employer elects to require medical certification to assess an employee's entitlement to FMLA leave, the employer must inform the employee "of the anticipated consequences of [the] employee's failure to provide adequate certification." 29 C.F.R.§ 825.305(d).

Once an employer makes such a request, an employee has fifteen days to submit a medical certification form to his or her employer explaining the reason for the leave of absence. *See* 29 C.F.R. § 825.306(b). Under the regulations, if the employer "finds a certification to be incomplete," it must "provide the employee a reasonable opportunity to cure any such deficiency." *See* 29 C.F.R. § 825.305(d); *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 337-38 (6th Cir. 2005). "[W]henever certification is requested, 'it is the employee's responsibility to provide the employer with complete and sufficient certification and failure to do so may result in the denial of FMLA leave.'" *Heard v. SBC Ameritech Corp.*, No. 05-71712, 2005 U.S. Dist. LEXIS 46464, at *23-24 (E.D. Mich. July 27, 2005), *aff'd* 205 F. App'x 355 (6th Cir. 2006).

A doctor's certification of a serious health condition is sufficient if it states: (1) the date on

-11-

which the serious health condition began, (2) the probable duration of the condition, (3) the appropriate medical facts within the health care provider's knowledge, and (4) a statement that the employee is unable to perform her job duties. *See Brenneman v. MedCentral Health System*, 366 F.3d 412, 422 (6th Cir. 2004) (citing 29 U.S.C. § 2613(b)). A medical certification is presumptively valid if it contains the required information and is signed by the health care provider, however an employer may overcome this presumption by showing the certification is invalid or inauthentic. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007).

"To prevail on an FMLA interference claim, a plaintiff must establish that (1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled." *Novak v. MetroHealth Med. Center*, 503 F.3d 572, 578 (6th Cir. 2007).

Jackson argues that it did not interfere with Clum's FMLA rights. Relying on Dr. Truluck's October 2, 2009 certification, Jackson asserts that it was within its rights to deny her request for FMLA leave because the certification indicated that Clum was able to perform her job duties. Jackson relies on *Nawrocki v. United Methodist Retirement Communities, Inc.*, 174 Fed. Appx. 334, 338 (6th Cir. 2006) for the proposition that the October 2, 2009 medical certification was a "negative certification" which entitled Jackson to deny Clum's request for FMLA leave. In *Nawrocki*, the plaintiff's treating physician indicated that the plaintiff had a serious health condition but answered "no" on the medical certification form as to whether it was necessary for the plaintiff to be absent from work for treatment. *Id.* at 338. The *Nawrocki* court opined that: "At most, the medical certification indicated that Clum requested an intermittent work schedule, but it was grossly insufficient in explaining her cumulative five day absence. As a result, Defendant was entitled to rely

-12-

on the face of the certification without further inquiry." *Id.*

Clum's attempt to now characterize her request for FMLA leave to excuse her September 2009 absences as related to both her hand and neck pain is contrary to the record evidence. While Clum claims that she verbally informed Jackson that her FMLA request was associated with her hand, as well as her neck condition, her email correspondence sent to her coworkers at Jackson, demonstrates that she never informed Jackson that her FMLA request was based on her neck condition. She stated "I had FMLA for my neck and could have called in and said my neck hurt and I would have been covered, but I'm an honest person and cannot do that." To be eligible for FMLA leave, an employee must "explain the reasons for the needed leave" to the employer, or "leave may be denied." 29 C.F.R. § 825.301(b). "When an employee seeks leave due to a FMLA-qualifying reason, for which the employer has previously provided FMLA-protected leave, the employee must specifically reference the qualifying reason for leave or the need for FMLA leave." 29 C.F.R. § 825.301(c).

Prior to her discharge, the only documents Jackson received from Dr. Truluck referred to Clum's hand pain. The October 2, 2009 certification indicated that Dr. Truluck's speciality was "Orthopedics-Hand/Upper Extremity." Nothing in the October 2, 2009 certification indicates that Clum was experiencing neck pain. Further, the October 14, 2009 Status Report referred only to "hand pain."

Clum never informed Jackson that her FMLA leave request was due to her neck condition, therefore Jackson cannot be faulted for denying Clum's FMLA leave request since the only certification indicated that her absence was due to her hand condition and did not prevent her from performing her job. In *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004), the Sixth Circuit Court of Appeals affirmed the district court's decision granting summary judgment in

favor of the employer on the plaintiff's FMLA claim. *Id.* at 422. The plaintiff in *Brenneman* suffered from diabetes and had "substantial attendance deficiencies" during the term of his employment. *Id*. On March 31, 2000, the plaintiff informed his employer that "he wasn't doing well and . . . wouldn't be in that day." *Id*. This absence triggered the plaintiff's suspension, as well as his termination pursuant to his employer's attendance policy because it was his third attendance-related suspension within five years. *Id*. The *Brenneman* plaintiff submitted an FMLA certification indicating that his absence from work was due to "intestinal flu" and did not mention his diabetic condition. *Id.* at 426-27. Further, the plaintiff never informed his employer that his absence was due to his diabetic condition prior to the his termination. *Id*. at 423. The *Brenneman* court concluded that the employer was entitled to deny the plaintiff's FMLA request because the flu was not a "serious health condition" under the FMLA, and the employer was not timely informed that the plaintiff's absence was caused by his diabetic condition. *Id*. at 427.

Similar to the plaintiff in *Brenneman*, Clum's certification made no mention of her neck condition, nor did Clum request FMLA leave based on this condition. Additionally, Dr. Truluck's October 2, 2009 Certification was complete, responsive and unambiguous, indicating the onset of her hand condition was three years ago and the medical information within Dr.Truluck's knowlege, thus Jackson was entitled to rely on it in denying Clum's request for leave. *See* 29 C.F.R. § 825.305(c) ("A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive.") The October 2, 2009 certification contained all of the applicable entries and it was not vague or ambiguous; rather it did not support leave because it indicated that Clum could perform her job functions. Although Jackson was not required by the FMLA, on October 6, 2009, Jackson

informed Clum in writing that Dr. Truluck's October 2, 2009 Certification did not support her request for leave. Jackson waited eight calendar days–until October 14, 2009– before terminating Clum's employment, and after Jackson verified that Dr. Truluck stood by his October 2, 2009 certification. Thus, Jackson was entitled to rely on the October 2, 2009 certification in denying Clum's FMLA request. *See Nawrocki*, 174 Fed. Appx. at 338; *Brenneman*, 366 F.3d at 412. Therefore, the Court finds that Clum's failure to submit a sufficient FMLA certification when requested demonstrates that she was not entitled to FMLA leave and her FMLA interference claim fails as a matter of law.

### b. Retaliation

The FMLA makes it unlawful for any employer to "discharge" or "discriminate" against anyone for taking part in proceedings or inquiries under the FMLA. *See* 29 U.S.C. § 2615(b). In order to establish an FMLA retaliation claim, Clum must first present a *prima facie* case of retaliation. *See Skrjanc v. Great Lakes Power,* 272 F.3d 309, 315 (6th Cir. 2001). The elements of a *prima facie* FMLA retaliation claim are: (1) the employee engaged in a protected activity; (2) the exercise of the protected right was known to the employer, (3) the employer took an employment action adverse to the plaintiff, (4) there was a causal link between the protected activity and the adverse employment action. *Arban v. West*, 345 F.3d 390, 404 (6th Cir. 2003). Once Clum establishes a *prima facie* case, the burden shifts to Jackson to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Nawrocki*, 174 Fed. Appx. at 339. Once Jackson presents a legitimate, non-discriminatory reason for the adverse employment action, Clum has the burden of showing the articulated reason is pretext for discrimination. *Id*.

Jackson argues that Clum cannot establish a prima facie case of retaliation under the FMLA because the October 2, 2009 certification form demonstrated that she was not entitled to such leave. A plaintiff cannot establish a prima facie case of FMLA retaliation where he or she fails to submit

a requested FMLA certification form demonstrating entitlement to FMLA leave. *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) (finding that the plaintiff failed to present evidence that she exercised a protected right under the FMLA because the medical certification form indicated that she "did not qualify for FMLA leave because her conditions were being controlled by medication, and she was able to perform the functions of her position[,] . . .therefore the medical leave she did take was not under the auspices of the FMLA."); *see also Heard v. SBC Ameritech Corp.*, No. 05-71712, 2005 U.S. Dist. LEXIS 46464, at *23-24 (E.D. Mich. July 27, 2005), *aff'd* 205 F. App'x 355 (6th Cir. 2006); *Willis v. Legal Aid Defender Ass'n, Inc.*, No. 11-11384, 2012 U.S. Dist. LEXIS 9303, at *33-34 (E.D. Mich. Jan. 26, 2012).

In any event, there is no evidence that Jackson terminated Clum because she invoked her FMLA rights. Jackson previously granted Clum FMLA leave in 2008 and in the Fall of 2009 when she demonstrated entitlement to FMLA leave. Here, the evidence presented shows that Jackson terminated Clum because she failed to provide sufficient medical certification of a serious medical condition entitling her to FMLA leave. Thus, the two unplanned absences in late September of 2009 warranted her termination pursuant to Jackson's attendance policy. Jackson is likewise entitled to summary judgment on Clum's FMLA retaliation claim.

### 2. ADA and PWDCRA

Clum also asserts claims under the ADA and PWDCRA. Michigan courts look to the ADA when examining claims under the PWDCRA. *See Lown v. JJ Eaton Place*, 235 Mich. App. 721, 728; 598 N.W.2d 653 (1999). The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of disability. *See* 42 U.S.C. § 12112(a). The PWDCRA provies that an employer shall not discharge an employee because of a disability unrelated to the employee's ability to perform the duties of a particular job or position. *See* MICH. COMP. LAWS § 37.1202(1)(b).

Clum can establish a *prima facie* case of disability discrimination by demonstrating she: (1) is disabled within the meaning of the ADA and the PWDCRA; (2) she was qualified for the position; (3) suffered an adverse employment action; (4) her employer knew or had reason to know of her disability; and (5) her position remained open or that similarly situated employees were treated more favorably. *See Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

Jackson first argues that Clum cannot establish that she suffers from a disability within the meaning of the ADA and PWDCRA. To qualify as disabled under the ADA, an individual must have an "impairment" that substantially limits a major life activity. 42 U.S.C. § 12102(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(a). To qualify as disabled under the PWDCRA, an individual must have an "impairment" which "substantially limits 1 or more of that individual's major life activities." *See* Mich. Comp. Laws § 37.1103(d)(i)(A).

As an initial matter, Jackson cannot rely solely upon Clum's hand condition to negate that she had a disability under the relevant statutes. Clum testified that Jackson was aware that her hand pain exacerbated her neck condition. Clum avers that at the time of her discharge, her neck condition substantially limited her ability to engage in walking, standing, bending, lifting, sleeping and working. Thus, there is a question of fact as to whether Clum had a qualifying disability under the ADA and PWDCRA.

Next, Jackson's contention that Clum was not qualified for her job because she could not comply with Jackson's attendance policies is without merit. Jackson impermissibly conflates Clum's qualifications for her position with its proffered reason for discharge. In *Wexler v. White's Fine Furniture*, 317 F. 3d 564, 574 (6th Cir. 2003), the Sixth Circuit Court of Appeals held in relevant

part:

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.
>
> \*                              \*                              \*
>
> Given the district court's confusion regarding what evidence was relevant to the question of whether Wexler was qualified, we take this opportunity to explicitly set forth what is required for a plaintiff to satisfy the qualification prong of the prima facie test. At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. . . . The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field.

Here there is a question of fact that Clum had the requisite skills to perform her job, which she held for ten years. In 2009, she received a positive performance evaluation for the previous year, which stated, among other things, " you have done a great job meeting standards in your current position."

Lastly, the Court rejects Jackson's argument that Clum cannot satisfy the fifth prong of her prima facie case, specifically that she has not identified similarly situated employees who were treated more favorably than she was. According to Jackson, the Level 1 and 2 Customer Service Representatives that Clum relies on to support her prima facie case are not similarly situated to her because they were junior level employees. In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), the Sixth Circuit Court of Appeals held that in order to be similarly situated, the comparator must: "[h]ave dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

Here, Clum and her comparators dealt with the same supervisor, were subject to the same

work rules and engaged in similar conduct. Clum testified that their job duties were essentially the same except that Clum would assist lower level representatives if needed. Jackson appears to argue that as a Level 3 Senior Customer Service Representative, Clum had supervisory authority over her comparators, however the job description Jackson provides does not state that her duties include supervisory duties. *See* Def.'s Mot. for Summ. J., Ex. 4. Clum further testified that her comparators were treated more favorably than she was because they were given time off without discipline. Furthermore, the Sixth Circuit Court of Appeals has held that the fifth element may be established by evidence of discriminatory statements made on the part of the decisionmaker. *See Blair v. Henry Filters,* 505 F.3d 517, 529 (6th Cir. 2007). Clum has presented evidence of Thuma's discriminatory labeling of Clum as a "Red Flag" associate who had a "pattern" of leaves and who needed to be closely monitored, as well as evidence of Akright's hostile demeanor once Clum returned to work after her neck surgery. Thus, Clum has presented sufficient evidence to demonstrate a question of fact as to this element of her prima facie disability discrimination claim.

Therefore, the Court finds that there are questions of fact for trial on Clum's ADA and PWDCRA claims.

### IV. CONCLUSION

For the reasons articulated above, Jackson's Motion for Summary Judgment [#30] is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated: February 22, 2013                /s/Gershwin A Drain_____
                                        GERSHWIN A. DRAIN
                                        UNITED STATES DISTRICT JUDGE